IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CINDA KROLL,

    Plaintiff,

v.

KAISER FOUNDATION HEALTH PLAN LONG TERM DISABILITY PLAN,

    Defendant.

No. C 09-01404 JSW

**ORDER REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Now before the Court are the parties' cross-motions for summary judgment. The Court finds that the matters are appropriate for disposition without oral argument and the matter is deemed submitted. *See* N.D. Civ. L.R. 7-1(b). Plaintiff's motion to file supplemental brief or, in the alternative, request for judicial notice is denied. (Doc. no. 86.) Having considered the papers and relevant legal authority, the Court GRANTS Plaintiff's motion and DENIES Defendant's motion for summary judgment.

**BACKGROUND**

Plaintiff worked as an executive staff assistant for Kaiser Foundation Health Plan, Inc. ("Kaiser"). (Administrative Record ("AR") at 369.) Plaintiff enrolled in the Kaiser Foundation Health Plan Long Term Disability Plan (the "LTD Plan"), for which real party in interest Metropolitan Life Insurance Company ("MetLife") is the claim fiduciary. The LTD Plan is

1  governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq*.
2  ("ERISA").

3        Participants under the LTD Plan are eligible to receive benefits if they satisfy the terms
4  of the Plan, which includes the following definition of disability:

> "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and
>
> 1.    during your Elimination Period and the next 24 month period, you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy; or
>
> 2.    after the 24 month period, you are unable to earn more than 80% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings.

(AR 27.)

      Plaintiff stopped working on July 28, 2006 due to "constant swelling of the left leg with chronic daily pain, unable to sit or stand for any reasonable length of time." (AR 360.) Her employer notified MetLife that Plaintiff's job required five to six hours of sitting, with one to two hours of standing, walking, bending over, twisting, and reaching above shoulder level, and occasionally required lifting or carrying items weighing up to ten pounds. (AR 369.)

      Plaintiff submitted an Attending Physician Statement dated September 18, 2006 from Dr. Bruce Rodriguez, an orthopedic surgeon. (AR 366-67.) Dr. Rodriguez stated that Plaintiff had "deep venous thrombosis post-op.," referring to a blood clot formed in Plaintiff's leg following her knee replacement surgery. Dr. Rodriguez recommended as a treatment plan that Plaintiff have physical therapy, range of motion, and participate in a pain clinic. (AR 366.) Dr. Rodriguez found that Plaintiff could stand or walk intermittently for 2 hours and that she could sit continuously. Dr. Rodriguez did not limit the amount of time Plaintiff could sit. (AR 367). Due to continued pain in her left knee, Dr. Rodriguez found that she could work for a total of four hours a day. (*Id.*)

1    According to her medical file, Plaintiff underwent a total left knee orthoplasty on

2 September 15, 2004. (AR 318.) On June 15, 2006, Dr. Rodriguez reported that Plaintiff,

3 approximately a year and a half after surgery:

4    continues to have significant amount of discomfort, she is in the Chronic Pain
     Clinic taking OxyCotin but her main issues pain wise is on the medial side of
5    the [left] knee. X-rays recent show everything to be in good condition.

6 (AR 316.) Dr. Rodriguez found that she had improved range of motion, good stability and no

7 increased redness, but that she was tender along the medial hamstring. His assessment was that

8 Plaintiff's chronic pain in her left knee was not getting better, but that in Plaintiff's own words,

9 she may be better than she was a year ago. (*Id*.)

10    On August 2, 2006, Plaintiff was seen by Dr. Sami Dughman. (AR 318.) Dr. Dughman

11 noted that Plaintiff had a manipulation under anesthesia on July 8, 2005 and that Plaintiff had

12 some improvement but still continues to have pain. Plaintiff went through the Pain

13 Management Clinic and was still taking OxyCotin. Plaintiff described her pain as dull but

14 constant. Dr. Dughman found that Plaintiff had increased pain, separate from the dull pain, at

15 the limits of her range of motion. She complained of recurrent swelling in her leg up to the

16 knee joint that gets really big by the end of the day at work. His knee examination showed no

17 effusion, arc of motion was 7-95 degrees with pain at the limits, an her implanted prosthesis

18 was well fixed and in excellent alignment. His assessment was left total knee arthroplasty with

19 residual pain and some decrease in range of motion. (AR 318.) Dr. Dughman recommended

20 that Plaintiff have an evaluation with the vascular service and a consult for post-phlebitic

21 syndrome, which he opined was contributing a fair amount to her residual pain and swelling.

22 (*Id*.)

23    On August 24, 2006, Plaintiff had a left leg doppler venogram. (AR 334.)

24    On September 25, 2006, Dr. Rodriguez noted that Plaintiff continued to have significant

25 discomfort at her left knee, associated with prolonged standing activities. She was being seen

26 by the pain management service and uses narcotics to manage the pain. (AR 320.) Plaintiff had

27 been on Coumadin (a blood thinner) because of a history of deep venous thrombosis ("DVT"),

28 although her last ultrasound did not show any DVT. He further noted that "there was some

3

1   thought that she might have post-phlebitic syndrome or even RSD in the past." (*Id.*)  Dr.

2   Rodriguez provided the following diagnosis:

> Patient with chronic [left] knee issuess, unresponsive to conservative management, no anatomic problems as far as x-rays or PX that would suggest surgical intervention. But clearly this patient is significantly debilitated with inability to stand for long periods of time and dependent swelling.

(*Id.*)  Dr. Rodriguez's plan was to call her primary care physician to discuss the possibility of taking Plaintiff off Coumadin to allow her to take anti-inflamatories and other types of medicine that may reduce any neurologic sensitivity in her leg.  (*Id.*)

On October 16, 2006, Plaintiff was seen by Dr. Michael B. Peterson.  (AR 321.)  He noted that Plaintiff complained of chronic pain in the left knee, leg heaviness, pain, enlargement and swelling of the knee when she is on her feet and wearing thigh-high stockings.  (*Id.*)  Dr. Peterson reported that both Plaintiff's legs were non-tender and found no deformity or pedal edema.  (AR 322.)   He concluded "[t]he etiology of her leg swelling is probably obesity and she needs to lose weight."  (*Id.*)   He also reported that "[s]ince the ultrasound did not find any venous insufficieny [sic] and her clot she had in 2004 was incredibly small and limited, she probably does not have chronic venous insufficiency."  (*Id.*)

On October 19, 2006, Plaintiff was seen by Dr. Ajanta Swarnakar.  (AR 324.)  Dr. Swarnakar noted that Plaintiff had been placed on Coumadin for DVT, discussed the medication with a cardiologist, Dr. Richard Chiang, and determined that the guidelines did not recommend Coumadin for Plaintiff's profile.  (*Id.*)  Dr. Swarnakar discussed the risks of discontinuing Coumadin with Plaintiff, who agreed to stop taking Coumadin.  (*Id.*)  On November 9, 2006, Dr. Swarnakar saw Plaintiff and reported that she stopped taking Oxycontin two weeks before and was walking ½ mile per day.  (AR 327.)

MetLife informed Plaintiff by letter dated January 5, 2007, that it denied her claim for long term disability benefits because the medical evidence did not support restrictions and limitations of such severity that would prevent her from performing the duties of her occupation.  (AR 287-288.)  Plaintiff appealed the denial.

By notice dated January 2, 2008, the Social Security Administration ("SSA") notified Plaintiff of its determination that she became disabled on July 31, 2006 and that Plaintiff was

4

entitled to disability benefits beginning January 2007. (AR 264.) By letter dated May 15, 2008, Plaintiff provided a copy of the SSA approval letter, as well as letters from primary care physician Dr. Swarnaker and surgeon Dr. Rodriguez, in response to MetLife's request for additional information. (AR 260.)

MetLife obtained an independent physician review by Dr. Marc Sloan. (AR 254.) By letter dated June 18, 2008, MetLife affirmed its decision to deny LTD benefits. (AR 242.)

The Court will address any additional specific facts as required in the analysis.

**ANALYSIS**

**A.     Legal Standard on Summary Judgment.**

A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A party moving for summary judgment who does not have the ultimate burden of persuasion at trial, must produce evidence which either negates an essential element of the non-moving party's claims or show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). A party who moves for summary judgment who does bear the burden of proof at trial, must produce evidence that would entitle him or her to a directed verdict if the evidence went uncontroverted at trial. *C.A.R. Transp. Brokerage Co., Inc. v. Darden*, 213 F.3d 474, 480 (9th Cir. 2000).

Once the moving party meets his or her initial burden, the non-moving party must go beyond the pleadings and by its own evidence "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). In order to make this showing, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). It is not the Court's task to

5

1  "scour the record in search of a genuine issue of triable fact." *Id.* (quoting *Richards v.*
2  *Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)). If the non-moving party fails to make
3  this showing, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at
4  323.

5  An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact
6  finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49
7  (1986). A fact is "material" if it may affect the outcome of the case. *Id.* at 248. "In considering
8  a motion for summary judgment, the court may not weigh the evidence or make credibility
9  determinations, and is required to draw all inferences in a light most favorable to the non-
10 moving party." *Freeman v. Arpaio*, 125 F.3d 723, 735 (9th Cir. 1997).

**B.     Standard of Review.**

ERISA allows a participant in an employee benefit scheme to bring a civil action to recover benefits due under the terms of a plan. 29 U.S.C. § 1132(a)(1)(B). Courts review a denial of benefits challenged under § 1132(a)(1)(B) "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989). When the administrator has such discretionary authority, the district court applies the deferential abuse of discretion standard. *Burke v. Pitney Bowes, Inc. Long-Term Disability Plan*, 544 F.3d 1016, 1023-24 (9th Cir. 2008).

The Kaiser Permanente Flexible Benefit Plan provides the various benefit program options, including LTD benefits, available to employees of Kaiser but does not describe the benefits. (Declaration of Joanne Carroll ISO Def's Revised Reply Brief ISO Mot. for Summary Judgment ("Carroll Decl.") ¶ 2.) The Kaiser Permanente Welfare Benefit Plan ("Welfare Benefit Plan") is the umbrella plan that covers all insured benefits and describes the benefits under the Kaiser Permanente Flexible Benefit Plan. (*Id.*) The Welfare Benefit Plan provides that the plan administrator and fiduciaries are granted discretionary authority:

> Discretionary Authority of Fiduciaries. Each Named Fiduciary, and each person to whom fiduciary authority shall have been allocated or delegated . . . shall have full and complete discretionary authority with respect to its responsibilities under the Plan and any Program hereunder. All actions,

6

interpretations, and decisions of a Named Fiduciary or a delegate thereof shall be conclusive and binding on all persons and shall be given the maximum possible deference allowed by law.

(AR 7.)

> Administration of Plans. The Plan Administrator or, to the extent delegated to one or more Insurers, such Insurer(s), shall have sole and full discretionary authority to administer each Plan, including but not limited to the following:
> . . .
> b. The discretionary authority to construe and interpret each and every document setting forth the applicable terms of a Plan, including but not limited to this document, Summary Plan Descriptions, and Contracts.
> . . .
> d. The discretionary authority to approve or deny claims for benefits under such Plan . . .

(AR 7-8.)

Another LTD Plan document, a booklet entitled "Your Employee Benefit Plan," also provides that the plan administrator and plan fiduciaries are granted discretionary authority:

> **Discretionary Authority of Plan Administrator and other Plan Fiduciaries**
>
> In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

These provisions in the LTD Plan documents are sufficient to vest discretion in the plan administrator and plan fiduciary, MetLife. Therefore, under *Firestone*, the Court reviews for abuse of discretion. As the Supreme Court recently stated, "Applying a deferential standard of review does not mean that the plan administrator will prevail on the merits. It means only that the plan administrator's interpretation of the plan "'will not be disturbed if reasonable.'" *Conkright v. Frommert*, 130 S.Ct. 1640, 1651 (2010) (quoting *Firestone*, 489 U.S. at 111).

The Court has determined previously that MetLife has a structural conflict of interest by acting as both the funding source and the administrator of the ERISA plan. (Doc. no. 25.) The Supreme Court has held that "[i]n the face of a conflict of interest, the standard of review remains abuse of discretion, but the analysis changes slightly." *Conkright*, 130 S.Ct. at 1646.

7

The court must weigh evidence of a conflict as a "factor in determining whether there is an abuse of discretion." *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008) (citations omitted). "When reviewing denials by administrators, the court is 'to determine lawfulness by taking account of several different, often case-specific, factors, reaching a result by weighing all together.'" *Id.* at 117. The Ninth Circuit has held that under this "combination of factors" review for abuse of discretion, "[t]he district court may, in its discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest; the decision on the merits, though, must rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc).

**C.     Denial of Coverage Decision Reviewed for Abuse of Discretion.**

Based on this Court's review of the administrative record, and considering relevant factors, the Court determines that it was unreasonable for MetLife to deny LTD benefits.

One factor that the Court considers is MetLife's decision to conduct a "pure paper" review of Plaintiff's claim, rather than conducting an in-person medical evaluation. *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 633 (9th Cir. 2009) (as amended). MetLife's independent medical evaluator, Dr. Sloan, noted that "I have had no contact with the claimant." Although the Plan does not require an independent physical exam, the decision to review Plaintiff's medical files rather than conduct an independent examination "'raises questions about the thoroughness and accuracy of the benefits determination.'" *Id.* (quoting *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 554 (6th Cir. 2008)).

MetLife contends that the record shows no objective medical evidence to support restrictions and limitations on Plaintiff's ability to work. On the contrary, MetLife's denial letter notes that Plaintiff's medical records reflect that she had total left knee replacement surgery in September 2004, followed by complications of DVT in her lower left leg. (AR 244.) On July 8, 2005, Plaintiff had manipulation of the left knee under anesthesia. (*Id.*) Among her medical diagnoses, Plaintiff was diagnosed with obesity, pre-diabetes, atrial fibrillation and post-thrombotic syndrome. (*Id.*) Plaintiff has reported chronic pain of her left knee and leg

8

since the time of the surgery associated with swelling. Plaintiff attempted physical therapy, compression stockings, chronic pain management programs and medications to control her pain. Furthermore, both Plaintiff's primary care physician and orthopedist opined that Plaintiff's disability in the left lower extremity significantly limits her ability to sustain full time work. (AR 262-63.)

In his independent review, Dr. Sloan noted that Dr. Frank reported in May 30, 2006 that Plaintiff could return to full duties, and concluded that the medical information "does not support functional limitations beyond 5/30/2006 and forward." (AR 256.) Dr. Sloan's sole reliance on a May 30, 2006 evaluation was unreasonable in light of the fact that he was required to determine whether the medical information supported functional limitations in two different periods, "02/08/06 to 08/06/06 and then 08/07/06 forward." (AR 255-56.) Dr. Sloan's review does not weigh evaluations or other medical information to assess Plaintiff's functional limitations after August 2006, nor does he address the specific determinations by Plaintiff's treating physicians. For example, Dr. Sloan noted that in an Attending Physician's Statement dated September 18, 2007, Dr. Rodriguez, Plaintiff's orthopedist, opined that based on Plaintiff's physical capabilities, which included sitting continuously and standing and walking two hours intermittently, he recommended four hours of work per day. (AR 255.) Dr. Rodriguez' opinion would support a finding of disability under the LTD Plan. In his review, however, Dr. Sloan failed to weigh or discuss Dr. Rodriguez' opinion.

The administrative record includes an evaluation by Plaintiff's primary care physician, Dr. Swarnakar, who opined that "Ms. Cinda Kroll's ability to work is significantly compromised because of her left leg pain and discomfort which is aggravated by prolonged activity, sitting or standing. In my opinion, Ms. Cinda Kroll's disability pertaining to her left lower extremity is permanent and stationary and it significantly impairs her ability to sustain full time work." (AR 262.) Dr. Sloan spoke to Dr. Swarnakar on May 30, 2008 and noted that Plaintiff "has chronic pain secondary to post phelbotic [sic] syndrome" and reported "increased pain with prolonged sitting and/or standing." (AR 255.) Despite Plaintiff's history of chronic pain following her knee replacement surgery and onset of DVT, and prescriptions for pain

9

medications, Dr. Sloan's review indicated that "[t]here were no objective findings in the reviewed medical documents or my telephone call with Dr. Swanakar [sic] that supports claimant's impairment from a sedentary job." (AR 256.) An ERISA plan administrator is not required to defer to the opinion of a treating physician in the context of making a benefits determination. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003). However, the record demonstrates that MetLife and its independent medical consultant gave only cursory review of Dr. Swarnakar's opinion and did not indicate whether his diagnoses were correct, or whether or to what extent Plaintiff's post phlebitic syndrome would affect Plaintiff's functional limitations.

Furthermore, Dr. Sloan noted in the medical history that Plaintiff was seen on September 25, 2006, by Dr. Rodriguez who noted that Plaintiff had chronic left knee issues, unresponsive to conservative management (AR 254), but Dr. Sloan did not consider or weigh Dr. Rodriguez evaluation dated October 25, 2007, which states that "since the patient's total knee arthroplasty she has continued to have discomfort in the left knee associated with swelling and a presumptive diagnosis of post-phlebitic syndrome in the left lower extremity. These signs have included tibial related swelling and subjective discomfort that keeps her from sitting or standing for prolonged periods of time." (AR 263.)

The Court also considers MetLife's failure to discuss the SSA's disability determination as to the reasonableness of its denial of benefits. The letter denying Plaintiff's appeal mentioned that the "SSDIB approval letter has been included in the appeal review [but the SSA's] determination is separate from and governed by different standards than MetLife's review and determination pursuant to the terms of your employer's plan." (AR 243.) Neither the denial letter nor Dr. Sloan's report discussed or weighed the findings by the SSA or differentiated those findings from MetLife's determination to deny benefits. "While ERISA plan administrators are not bound by the SSA's determination, complete disregard for a contrary conclusion without so much as an explanation raises questions about whether an adverse benefits determination was 'the product of a principled and deliberative reasoning process.'" *Montour*, 588 F.3d at 635 (citing *Glenn v. MetLife*, 461, F.3d 660, 674 (6th Cir.

10

2006), *aff'd by Glenn*, 554 U.S. 105).  "Ordinarily, a proper acknowledgment of a contrary SSA disability determination would entail comparing and contrasting not just the definitions employed but also the medical evidence upon which the decisionmakers relied."  *Id*. at 636.  The administrative record here lacks the opinion of the SSA administrative law judge or the SSA administrative record, as in *Montour*.  The Ninth Circuit has recognized that where the record is insufficient to make a disability determination, the plan administrator has a duty to inform Plaintiff of the deficient record and provide an opportunity to furnish the missing information.  *Id.*  Here, the record does not indicate that MetLife determined that the absent SSA record was necessary before denying benefits, much less notifying Plaintiff of the need to supplement the record.

Plaintiff contends that Dr. Sloan is biased and prepares biased reports, but the Court determines that the evidence of Dr. Sloan's reviews for other claimants do not demonstrate inherent bias, particularly in light of Dr. Sloan's findings in individual cases that the claimants' limitations were supported by medical evidence.  (*See* Doc. no. 81.)

Plaintiff also argues that MetLife failed to comply with procedural requirements under ERISA.  "A procedural irregularity, like a conflict of interest, is a matter to be weighed in deciding whether an administrator's decision was an abuse of discretion."  *Abatie*, 458 F.3d at 972.  Because the Court determines that MetLife abused its discretion in denying benefits, the Court does not reach the question whether MetLife violated ERISA regulations.

Having reviewed the record, the Court determines that MetLife's decision to deny Plaintiff long term benefits was an abuse of discretion.  The Court determines that remand is not required and that award of benefits is proper.  *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163 (9th Cir. 2001).

**D.     Social Security Offset.**

Plaintiff applied for and received Social Security Disability benefits ("SSDI").  (AR 264.)  The Plan provides for an offset of long term disability benefits based on an award of SSDI.  (AR 30.)   Therefore, the LTD benefits owed by MetLife to Plaintiff must be offset by the award of SSDI disability benefits.

11

The parties shall meet and confer on the amount of judgment owed to Plaintiff after calculating the SSDI offset and prejudgment interest. The parties must submit a stipulated judgment, or joint letter brief summarizing the parties' positions on the amount of LTD benefits and SSDI offset, by April 29, 2011.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is DENIED and Plaintiff's motion for summary judgment is GRANTED. Judgment shall issue in favor of Plaintiff upon determination of the amount of judgment to be awarded to Plaintiff.

**IT IS SO ORDERED.**

Dated: March 31, 2011

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE